## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JEANETTE SCICCHITANO SMITH
and ALEXANDER SMITH,

       Plaintiffs,                             **CASE NO. 2:21-cv-4983-HB**

v.

SPECTRUM BRANDS, INC.,
SPECTRUM BRANDS PET GROUP, INC.,
and UNITED PET GROUP, INC.

       Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE EXPERT OPINIONS OF CHRISTOPH FLAHERTY

## INTRODUCTION

This is a case about a fire purportedly caused by an aquarium Pump Motor that had been used without issue for more than sixteen years prior to the fire. Despite having the opportunity to inspect and test the product, Plaintiffs' experts could not identify anything wrong with the Pump Motor save that it was designed without "thermal protection." That opinion, offered by Plaintiffs' expert Christoph Flaherty, should not be permitted to air before a jury in this case because it was not derived from the sort of reliable methodology required under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence.

Rule 702 requires that expert opinion be based on the methods and procedures of science, not unsupported speculation. Mr. Flaherty's opinion, and specifically the methodology by which he derived his opinion, does not meet that standard:

- He did not test motors with and without thermal protection devices to evaluate which was more likely to prevent fires, nor did he review any literature or testing that would inform

him on the effectiveness of a thermal protection device in the product at issue. His opinion that the lack of a thermal protection device caused the fire is therefore speculation.

- Mr. Flaherty did not identify any thermal cutoffs available at the time the Pump Motor was manufactured that, in his opinion, could or should have been installed. His opinion that a thermal protection device could have been added therefore lacks factual foundation in that he could not identify a specific remedy to the purported defect and did not examine the feasibility of that remedy.

- Mr. Flaherty testified that he has opined between ten and twenty times previously that similarly sized motors with thermal protection devices caused fires, tacitly conceding that the purported "defect" of the absence of a thermal protection device would not have necessarily prevented the fire at issue.

- Mr. Flaherty did not attempt to rule out potential alternative causes of the fire in any reliable manner, rendering his opinion little more than guesswork issued without the rigors required to qualify as expert under Rule 702.

Because Mr. Flaherty failed to use the methods and procedures of science in reaching his opinions, his opinions are unreliable and Spectrum Brands, Inc., Spectrum Brands Pet Group, Inc., and United Pet Group[1] (collectively "Spectrum Brands") submit this brief in support of their motion to exclude his expert opinions.

## **FACTUAL BACKGROUND**

In this subrogated action, Plaintiffs seek damages arising out of a fire at their residence in Lincoln University, Pennsylvania. (See generally ECF 1-1 ("Complaint").) Plaintiffs allege the

---

[1] United Pet Group, Inc. ceased to exist on December 31, 2014. Spectrum Brands Pet Group, Inc. is a successor in interest to United Pet Group, Inc.

fire was caused by a defect and/or malfunction in a filter pump motor (the "Pump Motor") distributed by United Pet Group, Inc. (Compl. ¶ 12.)  Plaintiffs retained Christoph Flaherty "to provide electrical engineer support and expertise to the fire investigation" performed by Plaintiffs' origin and cause investigator.  (Exhibit 1 ("Flaherty Report") at 1.)

## LEGAL STANDARD

For expert testimony to be admissible in federal court, Rule 702 of the Federal Rules of Evidence requires that the trial judge serve "as a gatekeeper to ensure any and all expert testimony or evidence is not only relevant, but also reliable." UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres, 949 F.3d 825, 832 (3d Cir. 2020) (citing Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008)). In this capacity, the federal court must: (1) ensure the expert witness is qualified, (2) confirm the testimony will relate to matters requiring scientific, technical, or specialized knowledge, and (3) make sure the trier of fact will be assisted by the testimony. Id. (citing Daubert, 509 U.S. at 591). This burden on the proponent of the testimony must be satisfied "by a preponderance of proof." Oddi v. Ford Motor Co. 234 F.3d 136, 144 (3d Cir. 2000) (quoting Daubert, 509 U.S. at 593 n.10).  The test of admissibility of expert testimony is whether the testimony is supported by "good grounds." Karlo v. Pittsburgh Glass Works, LLC, 849 F.3d 61, 81 (3d Cir. 2017) (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 745 (3d Cir. 1994)).

## ARGUMENT

### I.   Mr. Flaherty's Opinions Are Not Admissible under Rule 702.

Mr. Flaherty opines that the "design and manufacture of the Marineland Eclipse aquarium pump motor lacked thermal protection which should have prevented an internal failure from igniting a fire." (Flaherty Rep. at 10.)  As defined by Mr. Flaherty, "[t]hermal protection is a device or design feature that is intended to limit or stop the operation of the motor should it

3

overheat, before it gets hot enough to ignite a fire."  (Exhibit 2 ("Flaherty Deposition") 21:3-14.)

Mr. Flaherty opines first that the Pump Motor was defective because it lacked a thermal protection

device.  (Id. 25:25-26:3.)  He opines next that the Pump Motor was defective because (1) it either

lacked impedance protection that would have prevented the motor from getting sufficiently hot to

ignite a fire or (2) the impedance protection was inadequate.  (Id. 10:13-25, 22:12-21, 25:9-22.)

### A.  Mr. Flaherty Should Not Be Allowed to Opine that the Pump Motor Was Defective Because It Lacked a Thermal Protection Device.

Although in his report, Mr. Flaherty referred generally to "thermal protection," (see

Flaherty Rep. at 10), Mr. Flaherty testified that the only thermal protection device that could be

used on a motor like the Pump Motor was a "[s]mall thermal cutoff device[]." (Flaherty Dep. 27:7-

14.)  To the extent that Mr. Flaherty opines that the Pump Motor was defective because it lacked

a thermal cutoff (or other thermal protection device), his opinion does not satisfy the substantive

restriction of Rule 702 that expert testimony must be reliable. See Elcock v. Kmart Corp., 233 F.3d

734, 741 (3d Cir. 2000) (citing In re Paoli, 35 F.3d at 741).

### 1.  General knowledge about thermal protection devices does not provide the facts or proof on which an expert opinion must be based.

Mr. Flaherty opines that the Pump Motor was defective because it did not have a thermal

protection device.  He claims that he knows that thermal cutoffs could have been used on the Pump

Motor because he has "seen and examined various examples," knows that "thermal cutoffs

included on bathroom ventilation fans, for instance, have a similar size," and, although he could

not recall specific makes and models, has "examined other water pumps that have thermal cutoffs

on them."  (Flaherty Dep. 50:22-51:14.)

Aside from his general knowledge of thermal cut-offs, Mr. Flaherty did not "mock up a

thermal cutoff," (id. 35:15-18), and did not prepare a "physical model or a computer simulation,"

(id. 54:24-55:8).  Mr. Flaherty did not "select any thermal cutoffs for this case" or even "any aspect of the thermal cutoff for this case."  (Id. 33:11-20.)  Mr. Flaherty did not identify any thermal cutoffs available at the time the Pump Motor was manufactured that, in his opinion, could or should have been installed. (Id. 55:18-21, 57:14-18.)  Mr. Flaherty did not do any practical research into how a thermal cutoff could be incorporated into the motor – he did not "analyze whether the thermal protection that [he] articulated here could be installed in a factory where these pumps are manufactured" or know how much adding a thermal cutoff to the motor would have added to the cost of manufacturing the pump.  (Id. 57:11-18.)  Mr. Flaherty did not install such a device on an exemplar product.  (Id. 54:24-55:8.)  Mr. Flaherty failed to make "any effort to locate an equivalent pump," (id. 105:16-18), and did nothing "to test the capacity of the thermal cutoff that [he was] referencing here to prevent overheating in the specific temperatures at issue here" (id. 57:19-23).

The reliability requirement of Daubert "means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation[.]'" In re Paoli, 35 F.3d at 742 (quoting Daubert, 509 U.S. at 590).  Where, as with Mr. Flaherty's opinion, "the analytical gap between the data and the opinion . . . is connected only by the ipse dixit of the expert," a district court properly excludes the expert "testimony because it fail[s] to meet the reliability standard."  Meadows v. Anchor Longwall & Rebuild, Inc., 306 F. App'x 781, 790 (3d Cir. 2009).

An opinion similar to the one offered by Mr. Flaherty was excluded by the court in Booth v. Black & Decker, Inc., 166 F. Supp. 2d 215 (E.D. Pa. 2001).  In Booth, a proffered expert opined "that the toaster oven contained a design defect in that it lacked a thermal cut-off device."  Id. at 219.  In a list reminiscent of the things that Mr. Flaherty did not do, the Booth court observed that the expert

> did not test his hypothesis concerning the thermal cut-off device. He
> did not sketch the kind of device he recommends, produce an
> example of such a device, or do any practical research into how the
> device could be incorporated into the toaster oven. He did not install
> such a device on an exemplar oven and test its capacity to prevent
> the oven from overheating.

Id. at 221. Despite these failings, the expert in Booth opined that a thermal cut-off could "easily" be incorporated into the toaster oven because a thermal cut-off device had been included on an oven sold in Canada and therefore could have been included on the one at issue in Booth. Id.

Just like the expert in Booth, Mr. Flaherty failed to test his hypothesis concerning the thermal cutoff but claimed that a thermal cutoff could have been included on the Pump Motor because he had seen thermal cut-offs included on bathroom ventilation fans and on other water pumps. (Flaherty Dep. 51:3-14.) The Booth court found the proffered expert's claim insufficient because the expert "provided the Court with no evidence" concerning the oven or the similarities between that oven and the one at issue in the case. Booth, 166 F. Supp. 2d at 221; see also Oddi, 234 F.3d at 146 (quoting Heller v. Shaw Industries, Inc., 167 F.3d 146, 153 (3d Cir. 1999)) ("A court 'must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used.'"). Just as in Booth, Mr. Flaherty provided no evidence regarding these other motors and the similarities between them and the Pump Motor at issue here. Just as the Booth expert's "general knowledge of the devices and their applications" was inadequate under Rule 702, 166 F. Supp. 2d at 218, 221, so too should this Court find that Mr. Flaherty's "general knowledge of the devices and their applications" is insufficient. Just as the Booth court found the proffered methodology was "deficient" because the expert "essentially offered no methodology at all," so too should this Court find that Mr. Flaherty's methodology "did not comply with the minimum requirements of Rule 702." Id. at 221.

2.     **Cognitive modeling does not save Mr. Flaherty's opinion**.

Mr. Flaherty attempted to salvage his lack of data or other evidence to support his opinion by claiming he modeled the Pump Motor with the thermal protection "cognitively." (Flaherty Dep. at 54:24-55:8.)

Mr. Flaherty himself detailed the steps required to determine the proper thermal protection for use in a given motor:

> That would be a process in the design and manufacture of the motor as the materials that the motor is made out of are selected and their thermal properties are known. They would determine what temperature those materials could handle, and then you would select devices or a device to ensure that temperatures resulting in the degradation of the materials, which the pump was manufactured out of, were not reached.
>
> In some cases, that might be an iterative process in terms of if a selected material can't handle the operating temperature of the pump or the motor windings, then different materials would have to be selected. And if it can, but the motor windings could get too hot for the material, then the set point of the cutoff device might have to be changed by selecting a different cutoff device to maintain a safe design.

(Flaherty Dep. 30:10-31:4.)  Mr. Flaherty did not follow these steps in "cognitively modeling" the addition of the thermal protection device to the Pump Motor.  Mr. Flaherty conceded:

- he did not know the operating temperature of the Pump Motor, something that "would be important for the designers and manufacturers of the pump to . . . know . . . in the selection of their thermal cutoff devices" (id. 31:5-13);

- he did not know the temperature of the potting material in which the Pump Motor was encased when it was placed, which is important because you would not "want to immediately cause [the thermal cutoff] to trip by pouring material on it that was hotter" (id. 49:8-50:11); and

- he did not take into consideration the set point for any thermal protection devices, the size of any thermal protection devices, or any specific thermal protection devices that would have been available in 2002 (id. 54:24-59:21).

Instead of following the process he described to "cognitively model" incorporation of a thermal protection device into the motor, Mr. Flaherty simply leaped to the conclusion that a thermal protection device should have prevented the fire, because a thermal protection device is something "that is intended to limit or stop the operation of the motor should it overheat, before it gets hot enough to ignite a fire."   (Flaherty Dep. 21:11-14.)   This is classic ipse dixit held inadmissible under Rule 702. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) (where an opinion is connected to the existing data by only the ipse dixit of the expert, the court may conclude that there is "too great an analytical gap" to allow the opinion); see also Meadows, 306 F. App'x at 790 (holding where "the analytical gap between the data and the opinion . . . is connected only by the ipse dixit of the expert," a district court properly excludes the expert "testimony because it fail[s] to meet the reliability standard.").

Reaching a conclusion that may seem intuitively logical to the proffering expert is not sufficient to meet the reliability standards under Rule 702 in the absence of evidence.  See Booth, 166 F. Supp. 2d at 221 ("While this intuitively seems like a logical conclusion, [the expert] provided the Court with no evidence . . .").  "[E]xpert testimony based on assumptions lacking factual foundation in the record is properly excluded." Meadows, 306 F. App'x at 790; see also Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002) ("It is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record.").

The court in <u>Oddi v. Ford Motor Co.</u> similarly found an expert's <u>ipse dixit</u> insufficient under Rule 702.  234 F.3d 136, 158 (3d Cir. 2000).  In <u>Oddi</u>, an engineer's proffered expert opinion was "based on nothing more than his training and years of experience as an engineer" rather than on any tests, calculations, or data.  The <u>Oddi</u> court found that the expert's failure to conduct tests or calculations showed the expert

> used little, if any, methodology beyond his own intuition.  There [wa]s nothing [] to submit to peer review, and it [wa]s impossible to ascertain any rate of error . . . .  Similarly, no standards control [the] analysis, and no "gatekeeper" can assess the relationship of [the expert's] method to other methods known to be reliable and the non-judicial uses to which it has been put.

<u>Id.</u>

Like the expert in <u>Oddi</u>, Mr. Flaherty's opinion relies only on his own say so.   In addition to not having done his own testing, Mr. Flaherty provided no evidence of whether pumps with thermal protection devices are less likely to ignite than pumps without thermal protection devices, and Mr. Flaherty confirmed in his deposition that he did not "look at data of pumps with and without thermal cutoffs and whether those caused fires" and did not "look at any sort of research paper or any sort of industry paper about pumps with thermal cutoffs and pumps without thermal cutoffs with respect to causing fires."  (Flaherty Dep. 53:19-54:2.)  Mr. Flaherty's opinion lacks scientific foundation and should be excluded.

### 3.    Mr. Flaherty's personal experience establishes that thermal protection devices do not prevent fires.

Mr. Flaherty testified that he has opined between ten and twenty times previously that a motor of a similar size to the Pump Motor with a thermal cutoff caused a fire.  (<u>Id.</u> 53:4-18.)  Mr. Flaherty further conceded that "thermal protectors can fail" and he could not say that a thermal protector would have prevented the fire in this case.  (<u>Id.</u> 58:8-19.)  Thus, Mr. Flaherty failed to

show that any hypothetical thermal protection in fact would have, or even could have, prevented the fire in this case. Therefore, there is no basis for the opinion that the Pump Motor was defective because of the absence of a thermal protection device when Mr. Flaherty concedes that thermal protective devices in motors have failed to prevent fires; such an opinion is, again, "unsupported speculation." In re Paoli, 35 F.3d at 742 (quoting Daubert, 509 U.S. at 590).

***

Mr. Flaherty's opinion regarding a thermal protection device that is offered without proof does not satisfy the Rule 702 admissibility test. See, e.g., In re Mushroom Direct Purchaser Antitrust Litig., No. 06-0620, 2015 WL 5766929, at *4 (E.D. Pa. Aug. 27, 2015) ("Without any analysis, Dr. Lopez's opinion regarding this issue is simply ipse dixit and is inadmissible under Rule 702."). Just as the Booth court excluded the opinion because the expert did not "provide [] sufficient evidence . . . to conclude [] his methodology was reliable," Booth, 166 F. Supp. 2d at 219, and the Third Circuit in Oddi held that the "proffered expert testimony was not admissible under Fed. R. Evid. 702," Oddi, 234 F.3d at 160, this Court should similarly exclude Mr. Flaherty's opinion regarding a thermal protection device.

**B.    Mr. Flaherty Should Not Be Allowed to Opine that the Pump Motor Was Defective because It Either Lacked Impedance Protection or the Impedance Protection Was Inadequate.**

In his report, Mr. Flaherty states that an "internal failure" in the Pump Motor caused the fire. (See Flaherty Rep. at 10.) An internal failure, however, is not necessarily a defect. During his deposition, Mr. Flaherty sought to address this issue. In addition to claiming the Pump Motor was defective because it lacked a thermal protection device, Mr. Flaherty claimed the Pump Motor was defective because the design of the Pump Motor, or the Pump Motor as manufactured, did not integrate thermal protection into the Pump Motor. (Id.) Specifically, Mr. Flaherty "questioned"

whether the Pump Motor had impedance protection and, if so, whether it was adequate.  (Flaherty

Dep. 10:13-25, 22:12-21, 25:9-22.)  He defined impedance protection as follows:

> Impedance protection is a design or manufacture of motors such that
> the windings of the motor are sufficiently resistive to the flow of
> electrical current that even under abnormal conditions, most
> common being a locked motor condition, that would tend to cause
> an excessive current draw in an overheating of the motor, that even
> under those circumstances, the impedance of the windings is high
> enough that it would not cause a thermal event. It would not get hot
> enough to ignite a fire or to cause permanent damage.

(Id. 21:25-22-11.)

        1.      **Mr. Flaherty failed to consider and rule out alternative causes of the fire when he concluded the impedance protection was lacking or inadequate.**

As evidence that the Pump Motor did not have any sort of thermal protection, including

impedance protection, Mr. Flaherty pointed to the fire: "And then the occurrence of the fire and

the manner of its occurrence showed that [the Pump Motor] either did not have impedance

protection or, if it did have impedance protection, it was inadequate." (Id. 25:7-22.)  Accordingly,

Mr. Flaherty's entire opinion is based only on the Pump Motor at issue in the fire and not on

examination of other pumps of the same model.  As clear from his report, Mr. Flaherty considered

whether other electrical devices found in the area of origin could have caused the fire.  (See

Flaherty Rep. at 8-10.)  As a review of his report demonstrates, Mr. Flaherty did not, however,

consider whether "internal failures" not related to a defect in the design or manufacture of the

impedance protection could have caused the fire.  (See generally Flaherty Rep.)

NFPA 921, the Guide for Fire and Explosion Investigations, is the generally accepted

industry standard for origin and cause investigations.  (Exhibit 3, ("Buckley Deposition") 39:9-

40:11.)  NFPA requires that investigators follow the scientific method, (id. at 39:24-40:5), which

Mr. Flaherty claims to have followed in rendering his opinion, (Flaherty Dep. 18:23-20:16).  Mr.

Flaherty's investigation was not faithful to the methods of NFPA 921, however, and was inconsistent with the long-standing requirement that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). For that reason, Mr. Flaherty's opinion that the Pump Motor was defective because it either lacked impedance protection or the impedance protection was inadequate should be excluded.

When pressed in his deposition, Mr. Flaherty acknowledged other potential causes of the Pump Motor overheating, none of which he addressed in his report. (See generally Flaherty Rep.)

One such cause of internal failure that would lead to overheating would be if water reached the Pump Motor's windings. (Flaherty Dep. 98:24-99:7.) The Pump Motor was encased in potting material to "prevent it from getting wet" and "to keep the water away from any of the electrical connections and/or electrical conductors that it might be exposed to otherwise." (Id. 98:18-23.) Mr. Flaherty conceded that if there were cracks in the potting material, then water could get into the windings. (Id. 99:8-18.) Mr. Flaherty further conceded that he did not know whether the potting material was cracked in the Pump Motor before the fire. (Id. 72:3-6.) Accordingly, Mr. Flaherty cannot exclude the possibility that water penetrated cracks in the potting material in the more than 16 year-old Pump Motor and caused the arcing that led to the fire.

Another such cause is excessive current from a power surge in the house. (Id. 73:19-25, 91:12-14.) Although Ms. Scicchitano Smith testified that there had never been problems with the electrical system in the current house (see generally Exhibit 4 ("Jeannette Scicchitano Smith Deposition") 36:20-37:10), no one was home on the weekend in question to assess what happened that weekend (see generally Exhibit 5 ("Alexander Smith Deposition") 41:2-48:12). Mr. Flaherty did nothing to eliminate that there was a power surge that weekend. (See generally Flaherty Rep.)

A locked rotor could also cause excessive current, which could cause the arcing that led to the fire.  (Flaherty Dep. 73:19-74:25.)   At the evidence examination after the fire, the Pump Motor's rotor was locked.  (Id. 75:2-10.)  Mr. Flaherty does not know if the rotor was locked as a result of damage from the fire or if the rotor locked before the fire.  (Id. 75:2-23.)

Mr. Flaherty's failure to exclude these other potential causes of the so-called "internal failure" does not align with the expectations of NFPA 921. NFPA 921 states in relevant part:

> The process of elimination is an integral part of the scientific method. All potential ignition sources present, or believed to be present in the area of origin should be identified and alternative hypotheses should be considered and challenged against the facts. Elimination of a testable hypothesis by disproving the hypothesis with reliable evidence is a fundamental part of the scientific method.

(Exhibit 6 ("NFPA 921, Guide for Fire and Explosion Investigations, § 19.6.5 (2017 ed.)".) Indeed, the standard instructs investigators not to eliminate a potential cause "merely because there is no obvious evidence for it." Id. § 19.5.  Investigators must have reliable evidence that a potential cause did not actually start the fire before eliminating that cause.  See id.  Mr. Flaherty has no such reliable evidence.  Mr. Flaherty's failure to consider potential alternative causes ignores those basic precepts of NFPA 921 and invalidates his causation opinions by the terms of that standard.

Accordingly, Mr. Flaherty's methodology is not consistent with the underpinnings required for admissible expert opinion under Rule 702, and his opinions on causation should be excluded. See, e.g., Bryte ex rel. Bryte v. Am. Household, Inc., 429 F.3d 469, 477-78 (4th Cir. 2005) (quoting NFPA 921, district court appropriately excluded opinion that failed to "'exclude all or even most of the other possible sources of the fire" and thereby "prevent expert speculation"); State Farm Fire & Cas. Co. v. Steffen, 948 F. Supp. 2d 434, 446 (E.D. Pa. 2013) (holding that the expert's "failure to base his opinion on facts and data and faithfully apply the NFPA 921 procedure and scientific method means in the end that there is 'too great an

analytical gap' between his method of interpreting the data and his ultimate conclusion as to the fire's cause. It therefore cannot be reliable." (citing Fed. R. Evid. 702(d); <u>Joiner</u>, 522 U.S. at 146)); <u>Chester Valley Coach Works, Inc. v. Fisher-Price, Inc.</u>, Case No. Civ. A. 99 cv 4197, 2001 WL 1160012, at *9-11 (E.D. Pa. Aug. 29, 2001) (excluding fire causation opinion where expert failed to follow NFPA 921 and appropriately exclude potential alternative causes).

Mr. Flaherty's decision to skip over a scientific analysis of obvious potential alternative causes betrays the reliability of his opinion that a defect in the Pump Motor's impedance protection caused the fire. "Failure to show the reliability of each step in an expert's methodology is fatal under <u>Daubert</u>." <u>In re Baycol Prods. Liab. Litig.</u>, 532 F. Supp. 2d 1029, 1042 (D. Minn. 2007) (citing <u>McClain v. Metabolife Int'l, Inc.</u>, 401 F.3d 1233, 1245 (11th Cir. 2005)).

> **2.  Mr. Flaherty did nothing to analyze the design of the Pump Motor and for that additional reason should be barred from testifying that there was a design defect.**

Further, to the extent that Mr. Flaherty seeks to opine that the design of the impedance protection in the Pump Motor was defective, "[I]n design defect cases, 'the plaintiff . . . may prove the defect by presenting expert testimony based on an examination of similar articles to the one that injured the plaintiff.'" <u>Ellis v. Beemiller, Inc.</u>, 910 F. Supp. 2d 768, 779 n.11 (W.D. Pa. 2012). (quoting <u>Dansak v. Cameron Coca-Cola Bottling Co.</u>, 703 A.2d 489, 495 n.8 (Pa. Super. Ct. 1997)). Mr. Flaherty did not examine any motors similar to the Pump Motor at issue in this case and did not make "any effort to locate an equivalent pump." (Flaherty Dep. 106:16-18.) Further, Mr. Flaherty failed to conduct any analysis of the design of the Pump Motor other than noting that it did not include a thermal protection device. (<u>See</u> Flaherty Rep. at 8.) For this additional reason, his opinion that the design of the Pump Motor was defective should be excluded.

    **3.**    **Mr. Flaherty's opinion that the varnish could have degraded over time lacks foundation.**

Mr. Flaherty testified that the Pump Motor's varnish, which is a thin layer of insulating material on the Pump Motor's windings, could have degraded over time, which he testified could have caused the Pump Motor to overheat.  (Flaherty Dep. 73:19-74:7.)  That opinion is not, however, "based on the 'methods and procedures of science.'"  In re Paoli, 35 F.3d at 742 (quoting Daubert, 509 U.S. at 590).  Instead, it is "'unsupported speculation[.]'"  Id.  Mr. Flaherty conceded that he had no evidence of inadequate varnish/insulation on the Pump Motor's windings at the time of its manufacture and did not know the chemical composition of the varnish on the windings.  (Flaherty Dep. 73:19-74:7, 97:3-98:4, 103:15-24.)  Mr. Flaherty also conceded that the dielectric test, which was done on every pump of this model before it left the manufacturer,[2] verified at the time of manufacture that the varnish was adequate.  (Id. 96:7-24.)  His opinion that the varnish could have degraded over time has no foundation and is based only on ipse dixit.  "[E]xpert testimony based on assumptions lacking factual foundation in the record is properly excluded."  Meadows, 306 F. App'x at 790; see also Stecyk, 295 F.3d at 414 ("It is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record.").  His opinion is not based on the methods and procedures of science.

***

Because there is too great an analytical gap between Mr. Flaherty's claim that the Pump Motor was defective because the impedance protection was inadequate, because he did nothing to support his claim that the design of the Pump Motor was inadequate, and because his opinion that

---

[2] (Exhibit 7 ("Elam Deposition") 31:21-32:22.)  Kevin Elam is responsible for product certification for electrical products at Spectrum Brands and manages the lab technician that runs tests in the test lab.  (Id. 10:18-11:6.)

the varnish may have degraded over time has no foundation, Mr. Flaherty's opinion is unreliable. Any effort to proffer such opinions should be precluded.

**<u>CONCLUSION</u>**

For the foregoing reasons, Spectrum Brands respectfully requests that the Court exclude the opinions proffered by Mr. Flaherty that the Pump Motor was defective.

This the 1st day of June, 2022.

/s/ *Tiffany M. Alexander*
Tiffany M. Alexander, Esquire
PA ID No. 88681
Tanenbaum Keale, LLP
1235 Westlakes Drive, Suite 215
Berwyn, PA 19312
Telephone: (610) 601-4608
Facsimile: (973) 242-8099
talexander@tktrial.com

and

/s/ *Dixie T. Wells*
Dixie T. Wells (admitted Pro Hac Vice)
N.C. State Bar No. 26816
Ellis & Winters LLP
300 North Greene Street, Suite 800
Post Office Box 2752
Greensboro, North Carolina 27402
Telephone: (336) 217-4193
Facsimile: (336) 217-4198
dixie.wells@elliswinters.com

Counsel for Spectrum Brands, Inc. and
Spectrum Brands Pet Group, Inc.